UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

In re: JOHN KEITH HUDSON and            Case No.: 3:09-bk-07857-JAF

GLENDA SUE HUDSON                      Chapter 12

    Debtors.

_____/

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

This case is before the Court upon Chapter Twelve Trustee's (the "Trustee") [Second] Amended Motion to Modify Confirmed Plan (the "Trustee's Motion to Modify"). (Doc. 138). Initially, the Trustee filed a Motion to Modify Confirmed Plan and an Amended Motion to Modify Confirmed Plan (Docs. 121, 123). John Keith Hudson and Glenda Sue Hudson ("Debtors") filed a paper styled as follows: (A) Hudsons' Response to Trustee's Motion to Modify Confirmed Plan [and] (B) Hudsons' Motion to Modify Confirmed Plan ("Debtors' Motion to Modify"). (Doc. 126). Thereafter, the Trustee filed a [Second] Amended Motion to Modify Confirmed Plan, to which Debtors did not file a response. (Doc. 138). The case proceeded to an evidentiary hearing, and at the conclusion of the hearing, the Court ordered simultaneous submission of the parties' closing arguments in writing. Pursuant to the Court's order, the Trustee submitted a brief as his closing argument (Doc. 142), to which Debtors filed a Response (Doc. 143). Upon consideration of the parties' papers, the Court makes the following Findings of Fact and Conclusions of Law.

### Findings of Fact

Until July of 2009, Debtors operated a chicken farm. Debtors ceased operating the farm in July of 2009 due to a termination of their contract with Pilgrim's Pride, a meat processor. As a

result of the abrupt termination of the chicken farming operation, Debtors suffered significant economic losses and filed Chapter 12 bankruptcy in September of 2009. (Doc. 1). Debtors' Schedule B lists a contingent claim for damages against Pilgrim's Pride indicating its value was unknown at the time Debtors filed their petition. (Doc. 1 at 13). Nevertheless, in the Order Confirming Chapter 12 Plan Allowing Claims and Directing Distribution (the "Confirmation Order"), the Court determined that any net proceeds from any settlement or judgment award resolving Debtors' claim for damages against Pilgrim's Pride constituted property of the estate and must be turned over to the Trustee for additional distribution to the general unsecured claimants.[1] (Doc. 88 at 5).

During the administration of the Plan, Debtors did not timely provide the Trustee with the Annual Net Disposable Income Affidavits as previously ordered in the Confirmation Order, and the Trustee made repeated requests for Debtors' financial information. (Doc. 138 at 2). Between February 1, 2013, and March 1, 2013, the Trustee finally received financial records, bank statements and net disposable income statements for 2010, 2011 and 2012.[2] (Doc. 138 at 2). Upon receipt of the Debtors' financial information, the Trustee discovered that Debtors had submitted a claim to the United States Department of Agriculture for financial assistance due to losses suffered from the shutdown of their chicken farming operation. (Doc. 142 at 1). Subsequently, in February of 2011, Glenda Hudson, received a grant in the amount of $100,000.00 (the "Grant").[3] (Doc. 142 at 2). The Trustee further discovered that on October 15, 2012, Debtors had entered into a Settlement Agreement and Release with Pilgrim's Pride and

---

[1] The Plan was further amended on November 12, 2010, but the amendments to the Plan are irrelevant to the issues presented by the parties. (Doc. 98).
[2] The Trustee had to resort to filing a Request for Production to receive certain financial information and bank statements from bank accounts that were not previously disclosed. (Doc. 138 at 2).
[3] The Grant was "split deposited" into three separate accounts in the following manner: $5,000.00 was deposited into a personal account of Debtors, $5,000.00 was deposited into a personal account of John K. Hudson, and $90,000.00 was deposited into the Hudson Baled Pine Straw, Inc.'s, business account. (Trustee's Ex. 4, Doc. 142 at 2).

settled their claim for damages for $175,000.00. (Doc. 138 at 2, Trustee's Exs. 5, 6). On November 13, 2012, Glenda Hudson, received the settlement proceeds in the amount of $105,000.00 (the "Settlement").[4] (Doc. 138 at 2, Trustee's Exs. 6, Doc. 121 at 3). Debtors did not turn over the Settlement proceeds to the Trustee and the following month's bank statement shows withdrawals of $110,930.94. (Doc. 142 at 2). Debtors did not inform their attorney that they had received the Settlement and, prior to the Trustee's discoveries, Debtors did not amend their bankruptcy Schedule B or seek any modification of the Confirmation Order. (Doc. 123 at 3). Instead, Debtors spent both the Grant and the Settlement.

The Trustee filed a Motion to Modify pursuant to 11 U.S.C. § 1229 and claims that the Grant is a prepetition asset and its value should have been included in the best interest of creditors calculation contained in 11 U.S.C. § 1225(a)(4). (Doc. 123 at 3, Doc. 138 at 3-4). The Trustee argues that under a hypothetical Chapter 7 case the unsecured class would have received an additional $75,000.00 from the $100,000.00 Grant. (Doc. 138 at 4). Additionally, the Trustee requests that Debtors turn over the Settlement pursuant to the explicit provision of the Confirmation Order requiring that they do so.[5] (Doc. 138 at 4). The allowed unsecured claims filed in this case amount to $720,125.29, and Debtors' current Plan provides for an approximate distribution to the unsecured class of $21,675.77 or 3.01%. (Doc. 138 at 4). Thus, the Trustee requests that the Court modify Debtors' next monthly payment of $6,627.13 to $186,627.13 to account for receipt of the Grant and the Settlement. (Doc. 138 at 4). Debtors claim that that they should not be required to turn over the Grant and raise many arguments to support their

---

[4] Debtors paid $70,000.00 in attorneys' fees. (Trustee's Ex. 6).

[5] In the Trustee's initial Motion to Modify Confirmed Plan and Amended Motion to Modify Confirmed Plan, the Trustee claimed that Debtors did not turn over a tax refund in the amount of $8,789.00 to him as required by the Plan. (Doc. 121 at 2, 123 at 2). However, this argument was not re-alleged in his Second Amended Motion to Modify Conformed Plan. (Doc. 138). Thus, the Court finds that the Trustee abandoned this argument and will not address its merit.

assertion. (Doc. 143 at 2-9). Debtors also request that the Court modify the Plan to eliminate or reduce their obligation to turn over the Settlement to the Trustee. (Doc. 143 at 8-9). The Court will address Debtors' arguments in turn.

## Conclusions of Law

### A. The Grant

The Court starts its analysis by determining whether the Grant is property of the estate. Section 1207(a)(1) of the Bankruptcy Code provides that property of the estate includes, among other things, all property that the debtor acquires after the commencement of the case but before the case is closed, dismissed, or converted to a case under chapter 7. See, e.g., FarmPro Servs., Inc. v. Brown, 276 B.R. 620, 624 (D.N.D. 2002) (holding that crop disaster payments which Chapter 12 debtors received post-petition were included in property of the estate as they were in the nature of proceeds of estate property); In re Ring, 160 B.R. 692, 692 (M.D. Ga. 1993) (holding that federal disaster relief payments arising post-petition were proceeds of property of the estate). Here, Debtors acquired the Grant after the commencement of their chapter 12 case, which had not been closed, dismissed, or converted to a case under chapter 7. Accordingly, the Grant is unquestionably property of the estate and should have been paid into the Chapter 12 Plan. However, the Plan did not provide for the turnover of the Grant to the Trustee because neither the Trustee nor Debtors knew Debtors were entitled to receive the Grant at the time the Court confirmed the Plan. For this reason, the Trustee requests that the Court modify the Plan and require Debtors to turn over the Grant to the Trustee.

The provisions of a confirmed plan are binding on both the debtor and the trustee. In re Ted Wiest & Sons Inc., 446 B.R. 441, 445 (Bankr. D. Mont. 2011). "If we fail or refuse to give effect to the terms of a confirmed plan and the legitimate expectations of the parties under it, we

4

will undermine the participatory nature of bankruptcy proceedings." Matter of Grogg Farms, Inc., 91 B.R. 482, 484-85 (Bankr. N.D. Ind. 1988). However, changing fortunes and unexpected circumstances also create a need for flexibility, and this need is addressed by § 1229[6]. Id. at 485. Although § 1229 of the Bankruptcy Court explicitly authorizes modification of the plan, it contains no indication of the circumstances under which modification may be requested or the standards for determining whether to grant such a request, other than the limitations imposed by section 1229. Nevertheless, at a minimum, the party requesting modification ought to be able to

---

[6] § 1229. Modification of plan after confirmation

(a) At any time after confirmation of the plan but before the completion of payments under such plan, the plan may be modified, on request of the debtor, the trustee, or the holder of an allowed unsecured claim, to--

(1) increase or reduce the amount of payments on claims of a particular class provided for by the plan;

(2) extend or reduce the time for such payments; or

(3) alter the amount of the distribution to a creditor whose claim is provided for by the plan to the extent necessary to take account of any payment of such claim other than under the plan.

(b)(1) Sections 1222(a), 1222(b), and 1223(c) of this title and the requirements of section 1225(a) of this title apply to any modification under subsection (a) of this section.

(2) The plan as modified becomes the plan unless, after notice and a hearing, such modification is disapproved.

(c) A plan modified under this section may not provide for payments over a period that expires after three years after the time that the first payment under the original confirmed plan was due, unless the court, for cause, approves a longer period, but the court may not approve a period that expires after five years after such time.

(d) A plan may not be modified under this section--

(1) to increase the amount of any payment due before the plan as modified becomes the plan;

(2) by anyone except the debtor, based on an increase in the debtor's disposable income, to increase the amount of payments to unsecured creditors required for a particular month so that the aggregate of such payments exceeds the debtor's disposable income for such month; or
(3) in the last year of the plan by anyone except the debtor, to require payments that would leave the debtor with insufficient funds to carry on the farming operation after the plan is completed.

5

show some change in circumstances from the date of the original confirmation hearing. 4 Alan J. Resnick and Henry J. Sommer, Collier on Bankruptcy, ¶ 1229.01[3] (2013) (hereinafter Collier on Bankruptcy). "Most commonly, modification is sought by a debtor when there has been an unanticipated substantial decrease in income or downturn in circumstances or by an unsecured creditor or the trustee when a debtor experiences a windfall." In re Cook, 148 B.R. 273, 278-80 (Bankr. W.D. Mich. 1992) ("Lottery winnings and large inheritances [of the debtors] mandate modification as much as any downturn in circumstances would."). Here, the Debtors' receipt of $100,000.00 constitutes an unanticipated change in circumstances from the date of the original confirmation hearing, justifying the Trustee's Motion to Modify.

Debtors argue that the Trustee's Motion should be denied because the Trustee did not introduce any evidence demonstrating "distribution of the gross $100,000.00 amount would not exceed the Debtors' disposable income for each succeeding month [nor] evidence that would demonstrate that [Debtors] would receive an increase in disposable income from other sources during the succeeding months after the $100,000.00 [Grant] was received." (Doc. 143 at 5). In other words, Debtors claim that the Trustee failed to establish that his request to modify the Plan will satisfy the requirements of § 1229(d)(2). In re Pearson, 96 B.R. 990, 992 (Bankr. D.S.D. 1989) (stating that the party proposing the change has the burden of proving that modification is proper). As mentioned before, § 1229(d) provides, in pertinent part, as follows:

> A plan may not be modified under this section-
>
> . . .
>
> (2) by anyone except the debtor, based on an increase in the debtor's disposable income, to increase the amount of payments to unsecured creditors required for a particular month so that the aggregate of such payments exceeds the debtor's disposable income for such month. . . .

6

It appears that the Legislature's intent behind this section was to prevent increases that would cause plan payments to exceed the debtor's disposable income. Collier on Bankruptcy, ¶ 1229.01[3]. "That is because Chapter 12 debtors are not like consumer debtors that tend to have regular monthly income and expenses." Id. Farmers and commercial fisherman are likely to have both income and expenses that fluctuate wildly from month to month. Id.

Debtors argue that the Trustee may not seek an increase in subsequent monthly payments to unsecured creditors based upon a one-time increase in Debtors' disposable income and provide the following example to illustrate the applicability of § 1229(d)(2) to a farmer in a chapter 12 case:

> By way of hypothetical, assuming [a] debtor's post-confirmation monthly disposable income equals $800.00. Assume that in one month, the debtor receives a successful harvest in the second year of his Plan which results in a one-time monthly disposable income of $10,000.00. Under 11 U.S.C. §1229(d), the Trustee may not ask the Bankruptcy Court to increase the payments to unsecured creditors each subsequent month by amortizing the $10,000.00 out over each subsequent months because the debtor's monthly disposable income from other sources in each succeeding month would remain at $800.00 per month.

(Doc. 143 at 4).

If the Court accepted the literal interpretation of § 1229(d)(2) advanced by Debtors, no chapter 12 trustee would ever be able to modify a plan in the case of a debtor who experienced a one-time windfall no matter its amount. Not only would such an interpretation of the Code render an absurd result, Aponte v. Gomez, 993 F.2d 705, 708 (9th Cir. 1993) ("It is a settled principle of statutory construction that a statute need not be given its literal meaning if doing so renders an absurd result which the legislature did not intend."), but it would also not ensure that farm lenders receive a fair repayment[7].

---

[7] "Congress expressly drafted Chapter 12 of the bankruptcy code to address the farm crisis of the mid–1980s. Proponents of the Act recognized that '[m]ost family farmers have too much debt to qualify as debtors under

7

As the Court noted, the Trustee seeks modification of Debtor's one monthly "payment of $6,627.13 . . . ." (Doc. 138 at 4). It is undisputed that long before the Trustee's Motion to Modify was filed, Debtors had already spent the Grant without informing the Trustee of its receipt. In addition, the evidence presented at the evidentiary hearing also created a reasonable inference that if any payment remaining in the Plan is modified to the amount of $186,627.13 it would exceed Debtor's disposable income for that month, as Debtors' farming operation is struggling financially.

However, the Court concludes that the Trustee satisfied the requirements of § 1229(d)(2) by establishing Debtors received the additional $100,000.00 in November of 2011 and that modification of a Plan payment would account for that receipt. Under the circumstances of this case, Debtors' "money is already spent" defense cannot not frustrate the Trustee's efforts to modify the Plan.

Debtors further argue that the Trustee is not entitled to claim "the gross amount of $100,000.00 because that amount does not reflect Debtors' projected disposable income." (Doc. 143 at 6). Debtors recognize § 1229(a) does not provide that any modification of a plan must reflect chapter 12 debtors' projected disposable income; nevertheless, they claim such requirement is proper. (Doc. 143 at 6, Doc. 146 at 7). Debtors argue that if the Court accepts the projected disposable income analysis, the Court should reduce the Grant by $124,942.98.[8] (Doc.

---

Chapter 13 and . . . have found Chapter 11 needlessly complicated, unduly time-consuming, inordinately expensive and, in too many cases, unworkable.'" Rowley v. Yarnall, 22 F.3d 190, 192 (8th Cir. 1994) (quoting H.R. Conf. Rep. No. 958, 99th Cong., 2d Sess. 48 (1986)). "The bill was designed to give family farmers facing bankruptcy a fighting chance to reorganize their debts and keep their land . . . while, at the same time, preventing abuse of the system and ensuring that farm lenders receive a fair repayment." Id. (internal quotations omitted).

[8] Specifically, Debtors indicated the Grant allowed them to cover the following expenses:

1. $26,089.60 2011 [T]axes on grant receipts (Attached Exhibit 2; check no. 9000)
2. $29,932.00 Funds stolen by bookkeeper Jennifer Fai Darling (Attached Exhibit 10; Restitution Order)
3. $13,349.56 Toyota payoff purchased by Ms. Hudson from her mother (Exhibit 1)

8

143 at 7). First, it should be noted that the Trustee seeks turnover of $75,000.00. Second, a close review of § 1229 discloses that a projected disposable income analysis is not necessary to modify a confirmed plan in chapter 12 cases. Thus, Debtors argument has no merit.

However, the Court recognizes that Debtors incurred certain expenditures which were out of their control. Specifically, Debtors suffered losses due to their former employee's theft, $29,932.00,[9] and had to pay "taxes on grant receipts" in the amount of $26,089.60. The modification of the Plan will account for these expenditures. Consequently, Debtors must turn over $43,978.40 to the Trustee while making their next payment. In addition, Debtors must turn over any restitution payments they received and will receive from their former employee during the administration of the Plan to the Trustee.

**Settlement**

It is undisputed that the Court ordered that Debtors turn over any net proceeds from any settlement or judgment award from Debtors' Pilgrim's Pride litigation to the Trustee for additional distribution to the general unsecured claimants because it was the property of the estate. (Doc. 98 at 5). It is also undisputed that Glenda Hudson, received a disbursement in lieu

---

| | | |
|---|---|---|
| 4. | | $9,476.82 Housing and office repairs because of leaks in roof and skirting because of mice infestation (Attached Exhibit 1) |
| 5. | | $1,000.00 Semi tires (Attached Exhibit 1) |
| 6. | | $3,000.00 Pine straw wagon purchase (Attached Exhibit 1) |
| 7. | | $8,000.00 Land Leases (Attach Exhibit 1) |
| 8. | | $5,295.00 Utility cart used for inspection of land over growing pine straw (Attached Exhibit 1) |
| 9. | | $2,000.00 4-Wheeler (Attached Exhibit 1) |
| 10. | | §26,800.00 Shifted from land lease account to operating account in order to "cover" bounced checks that were written by Jennifer Fai Darling (Attached Exhibit 1 at p 7). (These transfers did not pay the $29,932.50 that had previously stolen [sic] by Jennifer Fai Darling.) |

$124,942.98      Total Expenditures

(Doc. 143 at 8).
[9] In August of 2011, Debtors discovered that their bookkeeper stole approximately $29,000.00 from an account set up for, among other things, payroll taxes. Their bookkeeper was not paying outstanding bills. She was subsequently convicted of grand theft and must pay $248 per month in restitution to Debtors. Debtors received five payments before the evidentiary hearing. Debtors did not inform the Trustee that this theft has occurred.

of settlement in the amount of $105,000.00. (Trustee's Ex. 6). However, Debtors argue that the net settlement amount, which needed to be turned over to the Trustee is $75,000.00, not $105,000.00, because they had to pay $30,000.00 income tax on the Settlement.[10] The Trustee did not provide any argument to dispute this contention and requests, without any explanation, that Debtors turn over $105,000.00. Thus, the Court concludes that Debtors were required to turn over $75,000.00 pursuant to the Confirmation Order.

Debtors further argue their obligation to turn over net proceeds should be eliminated or reduced because of their losses due to theft committed by their bookkeeper and that the Court should apply these expenditures against the net proceeds of the Settlement. (Doc. 143 at 8). However, the Court has already considered Debtors' losses suffered due to their former employee's theft and concludes that under the circumstance of this case and the timing of Debtors' request for modification, it is improper. Debtors must comply with the Plan and turn over $75,000.00 to the Trustee with their next Plan payment. See In re Newman, 487 B.R. 193, 202 (B.A.P. 9th Cir. 2013) (stating that turnover of a tax refund is appropriate even though debtor already spent it on utility bills, their mortgage and other expenditures).

---

[10] In their Motion to Modify, Debtors argue that when determining the amount of net proceeds, the Court should factor expenses of $9,636.10 Debtors incurred to obtain the Settlement and conclude that the net proceeds equal $65,353.90. (Doc. 126 at 2). However, Debtors abandoned this argument in the brief submitted as their closing argument, in which they claim that the net proceeds of the Settlement equal $75,000.00. (Doc. 143 at 2).

The Court will issue a separate order granting the Trustee's Motion to Modify and denying Debtors' Motion to Modify consistent with these Findings of Fact and Conclusions of Law.

**DATED** this 28 day of February, 2014 in Jacksonville, Florida.

JERRY A. FUNK
United States Bankruptcy Judge

Attorney, Douglas W. Neway, is directed to serve a copy of this order on interested parties and file a proof of service within 3 days of entry of the order.